598 So.2d 415 (1992)
Terry FOURCADE
v.
CITY OF GRETNA, B.H. Miller and Lt. Charles "Chuck" Whitmer.
No. 91-CA-957.
Court of Appeal of Louisiana, Fifth Circuit.
March 31, 1992.
*417 B.R. "Bobby" Malbrough, Metairie, for plaintiff, appellant Terry Fourcade.
Dermot S. McGlinchey, David Israel, Eve Barrie Masinter, McGlinchey, Stafford, Cellini & Lang, New Orleans, W.J. Leblanc, Gretna, for defendant, appellees City of Gretna, B.H. Miller and Lt. Charles "Chuck" Whitmer.
Before GAUDIN, GOTHARD and CANNELLA, JJ.
CANNELLA, Judge.
Appellant, Terry Fourcade, appeals a judgment dismissing his suit for defamation against appellees, City of Gretna, B.H. Miller and Lt. Charles "Chuck" Whitmer. We affirm in part, reverse in part and remand.
Appellant entered the Gretna Police Academy in March, 1988. At that time, Lt. (now Captain) Whitmer, Lt. Levenston and Lt. Keith Bouvier were the directors of the academy under Chief B.H. Miller and Assistant Chief Arthur Lawson.
Appellant was a competitive power lifter (weight lifter) prior to entering the academy. He competed nationally and internationally and was able to bench press and leg lift more weight than available in the weight room at the academy. On one occasion, when going through the routine with the other cadets, it took three cadets to hold a punching bag that he was punching. Appellant regularly lectured against the use of steroids. He was a member of the *418 American Drug Free Power Lifting Federation, the United States Power Lifting Federation and the Natural Athlete Strength Association. In his career he never tested positive for steroids or any other illegal drug.
Approximately seven weeks after the beginning of the academy, Lt. Whitmer called appellant into his office and told him that he had the option of resigning or being ejected from the academy because he had heard that appellant was using and attempting to sell steroids. Lt. Henry Levenston was also present at the meeting. When questioned by appellant regarding the source of this information, Lt. Whitmer stated that he knew appellant was taking steroids and cadets had also told him. Appellant denied the accusations and offered to undergo a drug and polygraph test, but was refused. Lt. Whitmer told appellant that, if he didn't resign, he would see to it that appellant would never obtain a job in law enforcement. Appellant, therefore, resigned under protest.
Sometime later, Lt. Bouvier made statements to Keith Cheramie and Guidry that appellant had been "kicked out" of the academy for either using or for suspicion of using steroids. Neither man could remember the exact words, but both were left with the impression that appellant was using steroids. At the time, William Guidry was an emergency medical technician (EMT) with the Gretna Police Department and had known appellant for several years. Cheramie was a transportation officer with the Jefferson Parish Sheriff's Office. Cheramie had "worked out" regularly with appellant and had been friends with him for twenty years. Cheramie graduated from the Gretna Police Academy in 1981 and Guidry in 1986. Both men were surprised at hearing the comments by Bouvier and testified that the statements caused them to doubt that appellant was not a steroid user, contrary to their previous beliefs. However, at the time of trial, neither man believed the comments, having decided, over the course of time and after contacts with appellant, that he was innocent of illegal drug or steroid use.
Following his resignation, appellant informed his parents and two work friends of the events leading to his resignation. His father, John Fourcade, Sr., is a retired officer from the Gretna Police Department and he approached Lt. Whitmer the following day to find out what had happened. He was told the same story that appellant had been told.
Subsequently, appellant became depressed over the incident and sought counseling. He eventually was placed on anti-depressant medications in September 1988. One year later he wrote a suicide note and a month later he attempted suicide by taking a prescription overdose. He was hospitalized twice following the attempt.
Appellant filed suit against the City of Gretna, Lt. Whitmer and B.H. Miller, to recover damages as a result of the defamatory remarks regarding the selling and use of drugs and steroids. Trial was held on January 22nd and 23rd, 1991. At the close of appellant's case, the trial judge granted appellees Motion For Directed Verdict based on La.C.C.P. art. 1810.[1] Appellant thereupon orally moved to allow an amendment of his pleadings to conform to the evidence of a wrongful discharge. Memoranda were submitted and on February 28, 1991 the oral request to amend the pleadings was denied. Judgment on the Motion For Directed Verdict in favor of appellees was signed on March 25, 1991. It is from this judgment that appellant appeals.
The essential elements of a defamation action are defamatory words, publication or communication to a third person, falsity, malice (actual or implied) and resulting injury. Baudoin v. LP & L Co., 540 So.2d 1283 (La.App. 5th Cir.1989), writ denied 542 So.2d 1383 (La.1989); Cangelosi v. Schwegmann Bros. Giant Supermarkets, 390 So.2d 196 (La.1980).
*419 Words are defamatory which tend to expose a person to contempt, hatred, ridicule, or disgrace, or to injure him in his reputation, occupation, or public standing. Cashio v. Holt, 425 So.2d 820 (La.App. 5th Cir.1982), writ denied 430 So.2d 94 (La. 1983); Weatherall v. Dept. of Health & Human Res., 432 So.2d 988 (La.App. 1st Cir.1983); Brown v. News-World Publishing Corp., 245 So.2d 430 (La.App. 2nd Cir. 1971). However, the intent and meaning of the alleged defamatory statement must be gathered from the context as well as the words, and all parts of the statement and the circumstances of its publication must be considered to derive the true meaning. Brown v. News-World Publishing Corp., supra. Davis v. Southern Sav. Ass'n, 557 So.2d 1011 (La.App. 4th Cir.1990). See also: Weatherall v. Dept. of Health & Human Resources, supra. The test is the effect on those it is intended to reach. Brown v. News-World Publishing Corp., supra; See also: Weatherall v. Dept. of Health & Human Resources, supra. If the words are not defamatory per se, then the plaintiff must prove malice, which is, where the words or statements are made with reckless disregard for whether or not they are false. Wattigny v. Lambert, 453 So.2d 1272 (La.App. 3rd Cir.1984), appeal after remand 490 So.2d 1115, writ denied 493 So.2d 1221 (La.1986); Lemeshewsky v. Dumaine, 464 So.2d 973 (La.App. 4th Cir. 1985). When the words themselves have those results without considering extrinsic facts and circumstances, they are defamatory per se. Cashio v. Holt, supra. In that case falsity and malice are presumed, and the burden shifts to the defendant to rebut the presumption. Cashio v. Holt, supra. Madison v. Bolton, 234 La. 997, 102 So.2d 433 (1958).
First, appellant asserts that it was error to grant appellees Motion for Directed Verdict since he proved his case by a preponderance of the evidence. Second, he contends that the trial judge erred in refusing to allow him the opportunity to amend his petition based on the evidence produced at trial.
In his first specification of error, appellant asserts that, in unrefuted testimony, Lt. Whitmer accused him of taking drugs. According to appellant this statement is defamatory per se. Also, the statement made by Bouvier to Cheramie and Guidry, that appellant was kicked out of the academy for using and selling steroids, is defamatory per se. It was published and clearly is not privileged because neither of them had anything to do with the operation of the academy. Appellant contends that the statements made by Bouvier to Cheramie and Guidry were intended to defame because, at the time of the statements, appellant had already left the academy. Appellant contends that accusations of a crime are defamatory per se and relieve him of proving malice, an element of defamation.
Appellees contend that the trial judge correctly found the statements non-defamatory, because they were true. Appellant was dismissed for suspicion of selling and using steroids. Appellees contend that the accusation is not defamation per se because, at the time, steroids were not illegal. Appellees contend that publication of the statements was subject to a qualified privilege and that appellant failed to prove malice or injury as required by the law of defamation. As to any injury suffered by appellant, they point to his current success in weight lifting competitions; his imminent graduation from Southeastern Louisiana State University with a degree in Criminal Justice; his employment by the Orleans Parish Criminal Sheriff's Office; his acceptance into the Jefferson Parish Police Academy with a scheduled start in April, 1991; and his ability to obtain and keep a gun permit for the Parish of Jefferson.
The trial judge found that the accusation of using (and/or selling) steroids was defamatory per se, even though the use of the drug in certain circumstances was not made illegal until September of 1988, after appellant was forced out of the academy (La.R.S. 40:1239 and its 1990 and 1991 amendments acknowledge that not every sale, possession or distribution of anabolic steroids is unlawful). He found that the statements made to Cheramie and Guidry, that appellant was kicked out for suspicion of using and/or selling steroids, were true.
*420 Our review indicates that the witnesses were unable to remember the precise words used by Bouvier in the conversations. Cheramie testified as follows:
Q. Tell the court the circumstances that you found out from Keith Bouvier that Terry Fourcade was kicked out of the Gretna Police Academy.
A. At the time, I was working for the Sheriff's Department in transportation...
Q. The Jefferson Parish's Sheriff's Department?
A. Jefferson Parish. And I was on a ramp at Charity Hospital with an inmate that we transported over there, and Keith and another officer was there on the ambulanceand Keith and I were talking on the rampand he asked me if I heard what happened to my boy. And I asked, what boy? And he said Terry Fourcade. And I said, no, what? And he said he got thrown out the Academy for uh, using steroids.
. . . . .
Q. Maybe I can refresh your memory. I'm going to refer you specifically to page twenty-five (25). The question was posed, you were with Jefferson Parish. Your answer, right, I was bringing an inmate over there for treatment, had a clinic appointment or something like that and while on the ramp the ambulance pulled up. Keith and I were talking on the ramp and he said, hey, you heard about your boy and I said, what. And he says, Terry. I said, Terry who? And, he said, Fourcade. I said, no what? He said, he's not in the Academy anymore. And I said, really, why? And, he said, something to do with steroids. And I said, you're serious. Did hewas he any more specific, than that?
A. No, that was just about it.
(referring to his deposition)
Q. I'm going to now direct your attention to page twenty-eight (28). And so at page thirty (30). Question. What did he mean by, your boy? I imagine my friend and I said, who was that? And, he said, Terry. I said, Terry who? He said, Fourcade. I said, no, what? And he said, he's not in the Academy anymore. And I said, well, you know, what happened? And if I can remember exactly, he said it was because of steroids. Again, he never did say that it was because he was using steroids. Is that right?
A. Uh, I would imagine.
Q. And, you don't recall anything more specific than that it was related to steroids. Is that correct?
A. No, that was just an opinion, I got.
Q. Never anything that Lt. Bouvier told you?
A. From what I remember he said that's what he had heard.
Q. That it was related to steroids?
A. Right.
Q. Not that he was using steroids?
A. It was related to steroids.
Cheramie stated later, in his testimony, the effect this information had on him, as follows:
Q. And, none of this has caused you to change your opinion of Mr. Fourcade, is that correct?
A. At the time I heard the rumor, it, you know, was in uh my mind, you know, and after talking to Terry andand um, you know, you hear rumors and, you know, you hear things and you believe it, then you don't believe it, and then you gather facts and things like thatbut at the time, it did kind of, you know, put a strain on our friendship.
. . . . .
William Guidry testified as follows:
Q. Okay, go ahead.
A. And, I asked him, I saidwhat happened to Terry Fourcade, I heard he got kicked out the Academy. He said, yeah he did. I said, why? He says, uh, he got kicked out for using steroids.

*421 Q. Keith Bouvier told you that?
A. Yes, sir.
Q. Did you believe him? Did you know what to believe? Did you not believe him? What was your thought at that time?
A. I wasn't sure.
Q. How long have you known Terry?
A. About, I guess, about four or five years.
Q. Have you ever known Terry to use any drugs?
A. No, sir, not to my knowledge.
Q. But, you still had a doubt in your mind when Keith Bouvier told you that?
A. I don't know. Maybe he's a bodybuilder, you know, a lot of bodybuilders use it. I say, maybe he did under doctor's orders, but, that wasn't none of my concern at the time.
Q. But, when Keith Bouvier told you this, did that increase the doubt or did that cause the doubt, rather?
A. I guess it caused the doubt.
. . . . .
On cross-examination, Guidry stated:
Q. What, precisely, again and forgive me if I'm confused, did Mr. Bouvier tell you and when did he tell you?
A. He told me one day, outside of the Academy. I don't know what day it was, I just was talking and I asked him, or, you know, what happened to Terry Fourcade. And, he said, well he got kicked out the Academy. And, I said, what for? He says, using steroids.
Q. He said what?
A. Using steroids, using drugs.
Q. For using, or suspicion of using?
A. Not suspicion.
Q. Cause there is a difference.
A. Uh, he said he got kicked outfor drugs, for steroids. I don't remember if he used the word suspicion or not.
Q. Okay, cause on page 41 of your deposition, you said, I asked Keith about it and he says that he was suspected of using illegal drugs.
A. Okay.
There is a question as to the exact words used by Bouvier, but it is clear that Cheramie and Guidry were left with the impression that appellant was using steroids and their opinion of him was negatively affected by the information and tended to lower him in their esteem for a time. Thus, we find that the words of Lt. Whitmer and Bouvier were defamatory, given the context of the discussions. And, although not illegal, the public perception of them at the time was extremely negative. Thus, we think the words fall into the "defamatory per se" category, relieving appellant of the burden of proving malice.
At all times pertinent herein the actions of Bouvier and Lt. Whitmer took place while they were at work and employed by the City of Gretna.
An element of defamation is publication. Appellant must prove that the persons present at the time of the statements were third parties. See: Cangelosi v. Schwegmann Bros. Giant Supermarkets, supra. Clearly, the words were published herein to third parties, Cheramie and Guidry. Appellees assert that appellant published the information himself to his family, to two friends at the bar where he worked and also to a former high school teacher. Appellant contends that he had good reason to tell those people. Appellant was living with his family, hence it was necessary to inform them what (accusations) led to his dismissal. Co-workers were informed as an explanation for his necessity to work different hours. His ex-teacher was told in response to her concern for his apparent depression. Consequently, we find that publication was proven by appellant and he had good reasons to tell each person whom he told.
Next, appellant must show injury to his reputation as an element of defamation. Here, appellant had no difficulty in obtaining law enforcement opportunities, *422 and continued to compete in power lifting competitions. On the other hand, various cadets and others began referring to him openly as "druggie". This created pressure and stress leading to his depression and resulting suicide attempts. Furthermore, both Guidry and Cheramie testified that his reputation with them suffered for some time. Thus, we find that appellant has proven injury to his reputation.
Two defenses to an action for defamation are truth and privilege. Baudoin v. LP & L, supra. If the statements are true, the action must be dismissed. Brannan v. Wyeth Laboratories, Inc., 526 So.2d 1101 (La.1988). However, when a truthful statement carries a defamatory innuendo, it is not a defense unless the innuendo is true. Schaefer v. Fynch, 406 So.2d 185 (La. 1981).
Here, appellant showed that the allegations of steroid and/or drug use and sale were not true. There was no evidence presented by appellees to show truth because the trial judge granted the motion for involuntary dismissal before appellees put on their cases. Appellees argue that the statements made to the witnesses were that appellant was asked to to resign because of the suspicion of selling and/or using steroids, a true statement as found by the trial judge. But, the witnesses were unsure of the exact wording. Their testimony, however, was clear that the impact of the statements was that appellant was using the steroids. The statement also included the idea that he was "kicked out" of the academy. This is false, since he was asked to and given the opportunity to resign. Under Schaefer, this is an innuendo which is not true according to appellant's evidence and thus, constitutes defamation by the appellees herein.
Did a privilege exist to exculpate appellees from liability? Even if publication is proved in a defamation action, this court has held that a publication may be privileged. Cashio v. Holt, supra. Privileged communications are absolute or qualified. Carter v. Catfish Cabin, 316 So.2d 517 (La.App. 2d Cir. 1975). An absolute privilege exists in limited situations. Id. A qualified privilege arises from a social necessity of permitting full and unrestricted communication concerning a matter in which the parties have an interest or owe a duty. It exists so that free communication will not be inhibited by fear that the communicating party will be held liable in damages, if the communication is later held to be untrue or inaccurate. Carter v. Catfish Cabin, supra; A qualified privilege applies if the communication is made: 1) in good faith; 2) on any matter in which the person communicating has an interest to be upheld or in reference to which he had a duty; 3) limited in scope to this interest; 4) on a proper occasion; 5) in a proper manner; and 6) to a proper person having a corresponding interest or duty. See: Cashio, 425 So.2d at 822, citing Madison v. Bolton, supra. While it may be a sound defense, however, one of the primary requisites is that the communication be made in good faith. Baudoin v. Louisiana Power and Light Co., supra.
Despite appellees' assertions to the contrary, the comments to Guidry and Cheramie were not made by Bouvier in the context of any legitimate interest. The comments made by Lt. Whitmer to appellant's father were not made in the interest of the academy or in good faith. The accusations made by Lt. Whitmer to appellant in Lt. Levenston's presence do not fall within the privilege. Lt. Whitmer accused appellant without any substantial basis. He based it on what "some cadets told him" and on what "he knew for a fact". He refused to allow appellant to exonerate himself from the unsubstantiated accusations, so it cannot be said that the interview was conducted for investigation purpose or in good faith. Thus, we find there was no qualified privilege.
Appellant asserts that the trial judge erred in refusing to grant his Motion to Amend His Petition. He contends, pursuant to La.C.C.P. art. 1154, that he should have been allowed to amend his suit to conform to the evidence that he was wrongfully forced to resign from the academy. Appellees contend in rebuttal that no *423 such action for wrongful discharge from a police academy is available under the law, and no amendment is legally allowable after a final judgment is rendered. Further, they assert that the trial judge is vested with discretion as to whether or not to allow amendment of the petition and that he did not abuse his discretion herein. Appellant's motion to amend was made after the trial judge's oral statement that he intended to grant the appellees motion for involuntary dismissal. It was not reduced to a written judgment of dismissal until March 25, 1991. Then the judgment became final, not before, thus this argument by appellees is not persuasive.
In regard to the issue of "wrongful discharge", appellee asserts that there was no evidence that appellant was an "employee" and that an employment contract is required for an action for wrongful discharge in Louisiana. (La.C.C. art. 2749 and 163). Otherwise, they contend that an employee may be discharged at will. Appellant asserts that the action is tortious and that the evidence shows he was wrongfully accused of a act which harmed his reputation, as well as harming him personally.
Because of our intention to remand for completion of the trial, we pretermit the question of wrongful discharge. We find the facts herein also support an action for invasion of privacy, as well as defamation, because appellant was placed in a false light before the public, one of the four ways the right of privacy may be invaded. Jaubert v. Crowley Post-Signal, Inc., 375 So.2d 1386 (La. 1979); Ballaron v. Equitable Shipyards, Inc., 521 So.2d 481 (La.App. 4th Cir.1988); Gerard v. Parish of Jefferson, 424 So.2d 440 (La.App. 5th Cir.1982). Because the facts pled by appellant in his petition support a theory of recovery on the basis of invasion of privacy and the evidence presented supports a finding in appellant's favor, an amendment is not necessary.
The standard of review of the factual findings of a trial court is whether or not the trial court committed manifest error. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). The standard is the same for a review of a directed verdict or involuntary dismissal. Silvio v. Pharoah's Palace, 517 So.2d 185 (La.App. 1st Cir.1987). See also: Allen v. State Department of Health and Human Resources, 456 So.2d 679 (La.App. 5th Cir.1984). In this case, we find the trial judge erred in granting the Motion for Directed Verdict against the City of Gretna and Lt. Whitmer because appellant proved his case, at that point, by a preponderance of the evidence, of both defamation and invasion of privacy. However, because appellees were not given the opportunity to defend on these issues, we remand in order for the trial to go forward to completion.
We find that, relative to appellee, B.H. Miller, the trial judge did not err in granting the Motion for Directed Verdict because appellant did not prove his case against said appellee, by a preponderance of the evidence. We, therefore, affirm the judgment of the trial court in favor of B.H. Miller and against appellant dismissing the case of appellant, with appellant to bear the costs of court.
Accordingly, the judgment of the trial court is affirmed in part, reversed in part, remanded for continuation and completion of the trial.
Costs of this appeal are to be paid by appellees.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
NOTES
[1] The motion was improperly styled and referred to as a Motion for Directed Verdict. However, it should have been styled a Motion for Involuntary Dismissal based on La.C.C.P. art. 1672 since this is a non-jury trial.